# ORIGINAL

William M. McKeon
   bill@mimhawaii.com
Keri C. Mehling
   keri@mimhawaii.com
MCKEON IMLAY MEHLING
A Limited Liability Law Company
2145 Kaohu Street, Suite 203
Wailuku, Hawai'i 96793
Telephone: (808) 242-6644
Facsimile: (808) 244-9775

*[Other counsel listed on
signature page]*

*Attorneys for Individual and Representative
Plaintiffs Bruce Benedict, Joe Williams,
Joseph Baglino, James Brown and Adrienne Schmadeke*

Jonathan K. Levine (*pro hac vice* to
   be filed), jkl@girardgibbs.com
Elizabeth C. Pritzker (*pro hac vice* to
   be filed), ecp@girardgibbs.com
Todd Espinosa (*pro hac vice* to be
   filed), tie@girardgibbs.com
GIRARD GIBBS LLP
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846



FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 06 2012

at __ o'clock and __ min. __ M.
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| Bruce Benedict; Joe Williams; Joseph Baglino; James Brown; and Adrienne Schmadeke, on behalf of themselves and all others similarly situated, <br><br>    Plaintiffs, <br><br> v. <br><br> Diamond Resorts Corporation; Diamond Resorts Parent, LLC; Diamond Resorts Holdings, LLC; Resort Management International, Inc.; Stephen J. Cloobeck; Kathy Wheeler; Frank Goeckel; and Jason Toste, <br><br>    Defendants. | Case No. **CV12 00183 DAE BMK** <br><br> **COMPLAINT; SUMMONS; JURY DEMAND** <br><br><br> <u>**CLASS ACTION**</u> |

Plaintiffs Bruce Benedict, Joe Williams, Joseph Baglino, James Brown and Adrienne Schmadeke (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following:

## I.

## JURISDICTION AND VENUE

1.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d).  This action is a class action within the meaning of § 1332(d) in which the amount in controversy exceeds $5 million exclusive of interest and costs and in which at least one member of a plaintiff class is a citizen of a State different from that of a defendant.

2.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and a substantial part of the property that is the subject of this action is located in this District.  Specifically, this action challenges the imposition of a $65.8 million "Water Intrusion Assessment" upon owners of vacation timeshare interests managed by the "Diamond Resorts International" companies.  The defendants in this action (collectively, "Defendants") contend that the funds exacted through the Water Intrusion Assessment will be used to renovate Poipu Point, a 219-room vacation timeshare resort located in Koloa, Kauai, Hawai'i, that is managed by Diamond Resorts International.

## II.

## PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiffs

3.     Plaintiff Bruce Benedict is a citizen of Wisconsin, residing in Grantsburg, Wisconsin.  Mr. Benedict owns three biennial one-week vacation timeshare intervals in the Poipu Point resort in Koloa, Kauai, Hawai'i, for which he paid over $28,000.  By virtue of such ownership, Mr. Benedict is a member of the Association of Apartment Owners of Poipu Point ("AOAO"), which is further described herein.

4.     Plaintiff Joe Williams is a citizen of Hawai'i, residing in Lihue, Hawai'i.  He owns an annual one-week vacation timeshare interval in the Poipu Point resort in Koloa, Kauai, Hawai'i, for which he paid over $21,000.  By virtue of such ownership, Mr. Williams is a member of the AOAO.

5.     Plaintiff Joseph Baglino is a citizen of Florida, residing in Jacksonville, Florida.  Mr. Baglino owns a points-based Diamond Resorts Hawaii Collection vacation timeshare interest, for which he paid over $22,000.  By virtue of such ownership, Mr. Baglino is a member of the Diamond Resorts Hawaii Collection Members Association ("DRHCMA"), which is further described herein.

6.     Plaintiff James Brown is a citizen of Maine, residing in Poland Spring, Maine.  Mr. Brown owns a points-based Diamond Resorts Hawaii

Collection vacation timeshare interest, which cost over $39,000.  After trading in another timeshare interest he owned, he paid over $10,000 for this timeshare interest.  By virtue of such ownership, Mr. Brown is a member of DRHCMA.

7.      Plaintiff Adrienne Schmadeke is a citizen of Missouri, residing in Rolla, Missouri.  Ms. Schmadeke owns a points-based Diamond Resorts Hawaii Collection vacation timeshare interest, for which she paid over $13,000.  By virtue of such ownership, Ms. Schmadeke is a member of DRHCMA.

### B.      Defendants and Related Persons and Entities

### a.      Diamond Resorts International

8.      Defendant Diamond Resorts Corporation ("DRC") is a Maryland corporation with its principal place of business in Las Vegas, Nevada.  DRC and affiliated companies develop, own, operate and manage vacation ownership resorts.  DRC was formerly known as Sunterra Corporation.

9.      Defendant Diamond Resorts Parent, LLC ("DRP") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

10.     Defendant Diamond Resorts Holdings, LLC ("DRH") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

11.     Defendant Resort Management International, Inc. ("RMII"), which is also known as or is a successor in interest to Diamond Resorts Management, Inc., is a California corporation with its principal place of business in Las Vegas, Nevada.  RMII is the managing agent for the Poipu Point resort pursuant to a management agreement with the AOAO.  RMII is also the managing agent for the Diamond Resorts Hawaii Collection pursuant to a management agreement with the DRHCMA.

12.     On information and belief and based on statements contained on the www.diamondresorts.com website, "Diamond Resorts International" is a group of companies that includes DRC and its affiliates and operates under the direction and control of Defendant Cloobeck.  In keeping with their public statements and descriptions of their business and operations, Defendants DRC, DRH, DRP and RMII are collectively referred to herein as "Diamond Resorts International" or "DRI."  The companies comprising Diamond Resorts International act jointly as each other's mutual agents.

13.     Defendant Stephen J. Cloobeck is a citizen of Nevada.  Mr. Cloobeck holds himself out as the Chairman and Chief Executive Officer of DRI and as the person who directs and controls DRI's policies and business operations, including the conduct alleged herein.

4

b.      **Non-Party Entities**

i.      **Association of Apartment Owners of Poipu Point**

14.     Non-Party Association of Apartment Owners of Poipu Point ("AOAO") is a Hawai'i non-profit corporation with its principal place of business in Koloa, Hawai'i.

15.     The AOAO was initially formed in 1994 pursuant to Haw. Rev. Stat. Chapter 514A and the execution of a declaration of condominium property regime (the "Poipu Point Declaration") as the unincorporated Hawai'i condominium association for Poipu Point.  The AOAO was later incorporated as a Hawai'i not-for-profit corporation in 2007.

16.     The AOAO, acting through its board of directors, is responsible for administering Poipu Point in accordance with the Poipu Point Declaration, the AOAO corporate by-laws and other documents.  At all times relevant herein, the AOAO board had no more than five members.

17.     As further detailed herein, owners of deeded vacation timeshare intervals in Poipu Point ("Poipu Point intervals") have the right to reserve vacation accommodations at the Resort for specified periods of time, usually weekly on an annual basis.

18.     Owners of Poipu Point intervals are members of the AOAO by virtue of such ownership and have the right to vote in AOAO board of directors elections and to vote on other matters, either directly or by proxy.

19.     As further alleged herein, at all times relevant herein, a majority of the members of the AOAO board of directors were DRI employees or other persons acting on DRI's behalf.

20.     Another entity, the Poipu Point Vacation Owners Association ("VOA") was formed in 1995 pursuant to Haw. Rev. Stat. Chapter 514E.  Owners of Poipu Point intervals are also members of the VOA by virtue of such ownership. As alleged below, however, the AOAO — and not the VOA — charged the Water Intrusion Assessment at issue in this action.  As such, no claims against the VOA's directors are asserted herein.

### ii.     Diamond Resorts Hawaii Collection Members Association

21.     Non-Party Diamond Resorts Hawaii Collection Members Association ("DRHCMA") is a Delaware corporation with its principal place of business in Las Vegas, Nevada.  DRHCMA shares its address in Las Vegas with DRI.  The DRHCMA, acting through its five-member board of directors, is responsible for administering the Diamond Resorts Hawaii Collection (the "Hawaii Collection").

22.     The Hawaii Collection is a Nevada points-based vacation timeshare plan created in 2006 by Club Sunterra Development Hawaii, LLC under the name,

"Club Sunterra Vacations Hawaii." After the Diamond-Sunterra merger (as further described herein), Club Sunterra Vacations Hawaii was renamed the "Diamond Resorts Hawaii Collection."

23.    Owners of Hawaii Collection memberships receive periodic, usually annual, allocations of "points" that they may use like currency to book reservations at Hawaii Collection resorts. The number of points allocated to members depends on the type of membership owned. The number of points required to book a reservation depends on factors such as the type of accommodation, the resort and time of year.

24.    Currently, Poipu Point and three other resorts are included in the Hawaii Collection. Inclusion in the Hawaii Collection means that deeded Poipu Point vacation timeshare intervals have been placed in a trust (the "Hawaii Collection Trust") controlled by the DRHCMA board. The DRHCMA board has the authority to exercise the voting power associated with the Poipu Point intervals held in the Hawaii Collection Trust at AOAO elections.

25.    Owners of Hawaii Collection memberships are members of DRHCMA by virtue of such ownership.

26.    As further alleged herein, at all times relevant herein, a majority of the members of the DRHCMA board of directors were DRI employees.

7

c.     **Director Defendants and Non-Party Conflicted Directors**

27.     Non-Party Marilyn Windsor was a director on the AOAO board of directors and a DRI vice president for homeowners association relations.  Ms. Windsor left the AOAO board in November or December 2011 around the time that she left the employment of the DRI.  Ms. Windsor is a citizen of Nevada residing in the Las Vegas, Nevada area.

28.     Non-Party Cleana Dean was a director on the AOAO board of directors.  Ms. Dean left the AOAO board in November or December 2011.  On information and belief, Ms. Dean is the mother of the Diamond Resorts International employee, Linda Riddle, who acts as the principal liaison between the AOAO board and Diamond Resorts International.  Ms. Dean is a citizen of Nevada residing in Henderson, Nevada.

29.     Defendant Kathy Wheeler is a director on both the AOAO board of directors and the DRHCMA board of directors.  Ms. Wheeler is a vice president with the homeowners association division of Diamond Resorts International.   Ms. Wheeler is a citizen of Nevada residing in the Las Vegas, Nevada area.  Ms. Wheeler is sued herein based on her conduct as a member of the DRHCMA board of directors only.

30.     Defendant Frank Goeckel is a director on the DRHCMA board of directors.  Mr. Goeckel is a Diamond Resorts International senior vice president

for business development and homeowner association management.  Mr. Goeckel is a citizen of Florida residing in Windemere, Florida.

31.     In March 2012, Mr. Goeckel became a director on the AOAO board of directors, filling one of the vacancies left by the departure of Ms. Dean and Ms. Windsor.  Mr. Goeckel is sued herein based on his conduct as a member of the DRHCMA board of directors only.

32.     Defendant Jason Toste is a director on the DRHCMA board of directors.  Mr. Toste was first employed by Sunterra in 1999 and is currently a vice president for the Diamond Resorts International national inventory and rental department.  Mr. Toste is a citizen of Nevada residing in Las Vegas, Nevada.

33.     As further alleged herein, Ms. Windsor, Ms. Dean, Ms. Wheeler, Mr. Goeckel and Mr. Toste have all violated their fiduciary duties as members of the AOAO and DRHCMA boards of directors and violated their obligations under the Poipu Point Declaration, AOAO bylaws and DRHCMA bylaws.

34.     Pursuant to Haw. Rev. Stat. § 514B-161, Plaintiffs have made a request for mediation to Ms. Windsor, Ms. Dean and Ms. Wheeler based on their violations of their duties as directors on the AOAO board of directors .  If Plaintiffs and Ms. Windsor, Ms. Dean and Ms. Wheeler are unable to resolve their dispute through mediation, Plaintiffs intend to amend their complaint to assert claims against Ms. Windsor, Ms. Dean and Ms. Wheeler based on their violations of their

duties as AOAO directors.  As previously stated, Ms. Wheeler is currently sued herein based on her conduct as a member of the DRHCMA board of directors only.

## III.

## SUBSTANTIVE ALLEGATIONS

### A.    Poipu Point

35.    Poipu Point ("Poipu Point" or the "Resort") is a vacation timeshare resort that includes 219 lodging units.  It is located in Koloa, Kauai, Hawai'i on a site adjacent to the ocean.

36.    Poipu Point was built in 1991-1992.  There are approximately twelve Resort buildings, ten of which contain lodging units.  The Resort buildings are between one and four stories in height.

37.    Poipu Point was first operated as a condominium and vacation timeshare resort in 1994 as "Embassy Vacation Resort Poipu Point."  The original developer was Poipu Suite Partners, a Hawai'i limited partnership.  In 1995, the original developer conveyed all of its interests as Resort developer to Poipu Point Resort Partners, L.P., a Hawai'i limited partnership, whose partners consisted of entities owned or controlled by Signature Resorts, Inc. and Promus Hotel Corporation.  Promus Hotel Corporation owned the "Embassy" brand.

38.    In 1998, Signature Resorts, Inc., a Maryland corporation, changed its name to Sunterra Corporation ("Sunterra").

39.     In 2004, Sunterra purchased the remaining outstanding partnership interest in Poipu Resort Partners, L.P.

40.     In 2006, Sunterra ceased its use of the "Embassy Vacation Resorts" brand in connection with Poipu Point and began to refer to the Resort as a Sunterra "flagship" property in Sunterra's resort portfolio.

41.     Currently, there are two principal groups of persons who may make vacation timeshare reservations at Poipu Point: (1) persons who own deeded Poipu Point intervals and (2) persons who own points-based memberships in the Diamond Resorts Hawaii Collection timeshare plan.

**B.     The Diamond-Sunterra Merger**

42.     In 2007, Diamond Resorts, LLC and DR Resorts Holdings, LLC, two Nevada limited liability companies, effected a merger with Sunterra (the "Diamond-Sunterra merger") under the direction of Defendant Cloobeck.

43.     The Diamond-Sunterra merger was consummated as a "short-form" merger pursuant to the Maryland General Corporations Law, under which Sunterra was the surviving corporation.  In connection with the merger, Sunterra was renamed Diamond Resorts Corporation, with Cloobeck as its chairman, president and chief executive officer.  Under the merger, all the debts, liabilities and duties of Sunterra became the debts, liabilities and duties of the renamed DRC.

44.     In a January 2012 episode of the CBS television show, "Undercover Boss," Defendant Cloobeck described the Diamond-Sunterra merger as a purchase by Mr. Cloobeck of Sunterra with his personal funds:

> In late '06, there was a company by the name of "Sunterra" that was having problems.  I said, "Wow, this is a great opportunity."  So, I spent five and half million dollars of my own money, and I bought it!  So, it was my chore to figure out how to re-brand this joint.  So, I came up with "Diamond Resorts International," a pretty spiffy name.

45.     During the episode, Mr. Cloobeck further described his goal of creating a worldwide network of thousands of resorts that meet "Diamond standards" —

> [W]e have been acquiring a lot of resort companies that failed.  And, I've seen those resorts, prior to us acquiring them, in their old state and it's important for me to see how they've transformed and how well the "Diamond" brand has been taught.  I will one day have thousands and thousands of resorts worldwide and will be known synonymously with the legacy of Marriott and Hilton.  I will be that great hotelier.

46.     Defendant Cloobeck controls and directs all aspects of the operations of the Diamond Resorts International companies — including customer service, the booking of resort reservations, sales and the management of resorts.

47.     In an April 26, 2010 presentation at the Milken Institute, Mr. Cloobeck stated that he personally trained the property managers at each DRI resort, going as far as to specify the manner in which towels were to be folded.

48.     Defendant Cloobeck's photograph hangs in the Poipu Point lobby in front of the registration desk.  In the "Undercover Boss" episode, Mr. Cloobeck discussed the importance and prominence of a resort's front desk and stated that he had his picture placed at the front desks of DRI-branded resorts "[f]or obvious reasons[.]"

49.     Prior to the issuance of the Water Intrusion Assessment, Mr. Cloobeck's personal business card was provided at each DRI resort's front desk.

### C.     Defendants DRI and Cloobeck's Operation of Poipu Point After the Diamond-Sunterra Merger

50.     On information and belief and based on public statements by DRI, all of the buildings at Poipu Point have been damaged by water intrusion and leaks over a multi-year period.

51.     At least as early as 2006, Sunterra (as Defendant DRC was known before the Diamond-Sunterra merger) was aware of the existence of water intrusion problems and damage at Poipu Point and had retained at least two engineering and construction experts to investigate the problem and prepare written findings.

52.     On information and belief and based on the fact that Poipu Point was a Sunterra flagship resort, Defendants DRI and Cloobeck were aware of the existence of water intrusion problems at Poipu Point before the Diamond-Sunterra merger.  Rather than promptly take meaningful action to correct the water intrusion

problems, the AOAO board of directors, acting at the behest of Defendants DRI and Cloobeck, commissioned a series of further studies.

53.     On information and belief and as further alleged herein, those further studies were merely a distraction and delaying tactic employed while DRI solidified its control and domination of the AOAO board, stifled AOAO members' attempts to organize in opposition to DRI's activities and made preparations so that DRI would be positioned to maximize the financial benefit it would receive through the Water Intrusion Assessment that was eventually charged.  Specifically, as detailed herein, DRI did this through, among other things, intimidation of AOAO board members who were not DRI employees, causing the DRI-controlled AOAO board to deny AOAO members' valid requests for the AOAO membership list, significantly reducing its holdings of Poipu Point intervals and using its control of the AOAO board to significantly increase the fees paid to DRI for management of the Resort.

54.     DRI also continued to sell Hawaii Collection memberships knowing that purchasers were, in essence, buying into a future water intrusion assessment and, as described below, without adequately disclosing this fact to purchasers.

55.     On information and belief, during the past five years, the Poipu Point buildings have continued to deteriorate as a result of Defendants DRI and

Cloobeck's deliberate delay in addressing the water intrusion problems at the Resort.

**D.    DRI's Control and Domination of the AOAO Board**

56.    From the time of the Diamond-Sunterra merger through the issuance of the Water Intrusion Assessment in 2011, as further alleged herein, DRI employees — such as Ms. Windsor, Ms. Wheeler and Troy Magdos — or other persons acting on DRI's behalf — such as Ms. Dean — have comprised a majority of the members serving on the AOAO board.

57.    Mr. Magdos was a member on the AOAO board of directors from 2007 to 2010 and was also a DRI senior vice president during that time.  After his departure from the AOAO board, he continued to attend AOAO board meetings in his capacity as a DRI employee.

58.    Throughout the time period relevant herein, AOAO board meetings were run by Linda Riddle, a paralegal employed by DRI.  According to statements made by AOAO board member Jacalyn Anderson, Ms. Dean is Ms. Riddle's mother.

59.    DRI has used verbal abuse, intimidation and harassment to prevent board members not employed by DRI or related to DRI employees, such as Ms. Anderson, from taking any action to oppose DRI's control of the AOAO board.

60.     In 2009, in her capacity as an AOAO board member, Ms. Anderson made inquiries to other resort management companies regarding pricing for resort management services.  When DRI learned of these pricing inquiries, Ms. Anderson was forbidden from making any further inquiries.

61.     DRI forbade AOAO board members from answering e-mail inquiries from AOAO members.  Instead, board members were required to forward all such inquiries to Ms. Windsor who prepared a response, which was then sent to DRI's legal counsel for review.  After the response was reviewed, it was sent to the AOAO board member, who was then required to send the response to the AOAO member.

62.     DRI also specifically forbade Ms. Anderson from providing information to other Poipu Point owners regarding a decision by a timeshare owner association for a resort in Florida, Polynesian Isles, to terminate that association's management agreement with a DRI-affiliated management company and litigation related to those events.  Linda Riddle informed Ms. Anderson that Ms. Anderson would be subject to discovery in the Polynesian Isles litigation because she had learned of the existence of that lawsuit.

63.     Elizabeth R. Brennan, executive vice president and general counsel for DRI, sent Ms. Anderson an undated letter by e-mail and certified mail on "Diamond Resorts International" letterhead admonishing Ms. Anderson that

providing AOAO members with information regarding Polynesian Isles and the scheduling of an AOAO board meeting was contrary to Ms. Anderson's duties as an AOAO board member and directing Ms. Anderson to immediately cease and desist such conduct.  In her letter, Ms. Brennan further stated: "If you fail to do so, Diamond will take all action necessary to enforce its rights, including but not limited to, litigation."

64.    Ms. Anderson has stated that, as a result of DRI's conduct towards her, she is afraid for her life.

### E.    DRI and Windsor, Dean and Wheeler Colluded to Impede AOAO Members from Organizing in Opposition to DRI's Control of the AOAO and Its Board

65.    On information and belief, DRI was able to ensure that a majority of the AOAO board of directors were DRI employees or others acting on its behalf through a two-prong strategy.  First, DRI, through its direct ownership of Poipu Point intervals and intervals placed in the Hawaii Collection Trust, controls the largest single bloc of AOAO voting power, which it exercises to elect its employees and others under its control to AOAO director positions.  Second, DRI prevents individual owners of Poipu Point intervals, who do comprise a majority of AOAO voting power, from organizing to elect AOAO board members who are not controlled by DRI.  At the time of the issuance of the Water Intrusion Assessment,

individual owners owned approximately 63% of the approximately 11,000 Poipu Point vacation timeshare intervals.

66.   The second prong of DRI's strategy is crucial.  Because DRI does not control an outright majority of the AOAO voting power, in order to maintain a majority on the AOAO board, it must prevent individual AOAO members, who do collectively own a majority of the Poipu Point intervals, from organizing to oppose DRI.  As alleged herein, DRI has done this through violation of individual AOAO members' rights under the AOAO by-laws and through threats and intimidation.

67.   After the Diamond-Sunterra merger, several AOAO members concerned about DRI's involvement in the operation of Poipu Point formed a group called the Concerned Deeded Owners at the Point at Poipu and established a website. The purpose of the group, which was later renamed Concerned Owners at the Point at Poipu ("COPP"), was to organize as informed AOAO members to exercise better oversight over the AOAO and its operations.

68.   One of the group's priorities was to obtain the AOAO membership list in order to organize voting and proxy drives to elect AOAO board members who were not under DRI's control.

69.   Article VI, Section 7 of the AOAO by-laws requires the AOAO board or those acting on its behalf to maintain a list of AOAO members' names and addresses, which must be provided to AOAO members on request:

The resident manager or the Managing Agent or the Board shall keep an accurate and current list of the members of the Association and their addresses, including the names and addresses of all vendees under any agreement of sale on an apartment in the Project, if any. This list shall be maintained at the address of the Project or elsewhere within the State of Hawaii as designated by the Board and a copy thereof shall be available, at cost, to any member of the Association, as provided in the Declaration or By-Laws or Rules and Regulations or, in any case, to any member who furnishes to the resident manager or the Managing Agent or the Board a duly executed and acknowledged affidavit stating that the list (a) will be used by such owner personally and only for the purpose of soliciting votes or proxies or providing information to other owners with respect to Association matters, and (b) shall not be used by such owner or furnished to anyone else for any other purpose.

70.     In December 2009, members of COPP submitted written requests for the AOAO membership list in accordance with the AOAO by-laws.

71.     On information and belief, all such requests for the AOAO membership list by COPP members were refused by the AOAO board — including by Ms. Windsor, Ms. Wheeler and Mr. Magdos — at the direction of DRI.  Such refusal violated Article VI, Section 7 of the AOAO by-laws.

72.     Such refusal also violated the provision of the AOAO by-laws that prohibit votes by conflicted directors.  Mr. Magdos, Ms. Windsor and Ms. Wheeler had a conflict of interest with regard to the AOAO board's decision to release the membership list in that they were DRI employees and it was essential to DRI's continued control and domination of the AOAO board that the membership list not be released.

19

73.     Article III, Section 13 of the AOAO by-laws prohibits any director serving on the AOAO board of directors from voting on any issue in which the director has a conflict of interest:

> A Director shall not cast a proxy vote at any Board meeting, nor shall a Director vote at any Board meeting on any issue in which such Director has a conflict of interest.  The Director shall disclose the nature of the conflict of interest prior to a vote on that issue at the Board meeting, and the minutes of the meeting shall record the fact that a disclosure was made.  The determination of whether a conflict of interest exists as to a particular Director or Directors shall be made by a majority of the Directors (excluding the Director or Directors alleged to be involved in a conflict of interest), which determination shall be conclusive and binding on all parties.

74.     On information and belief, the AOAO board decision to refuse to release the AOAO membership list also failed to comply with Article III, Section 13 in that Mr. Magdos, Ms. Wheeler and Ms. Windsor voted to refuse to release the list despite their conflict of interest, no disclosure of that conflict was made and no formal determination of the existence of a conflict regarding the DRI-employee directors was made by non-conflicted directors (to the extent that any non-conflicted directors existed).

75.     In February 2010, AOAO member Robert Halem, who was then a candidate for a position on the AOAO board of directors, submitted a request for the AOAO membership list for the purpose of soliciting votes and proxies from other AOAO members related to his candidacy.

76.     On February 9, 2010, Shawn W. Ericson sent Mr. Halem a letter on "Diamond Resorts International" letterhead stating that the AOAO board "elected not to release the owners list to those persons who have requested it." The letter identified Mr. Ericson as a senior vice president of resort operations at DRI's "World Headquarters" in Las Vegas, Nevada.

77.     On August 26, 2010, Ms. Brennan sent a letter to Plaintiff Williams via certified mail in response to his written complaint that the AOAO membership list was being improperly withheld from members. Ms. Brennan stated that, in a February 2010 meeting, the AOAO board "came to the decision that the owners list would not be released to those persons who have requested it." As with her prior correspondence, Ms. Brennan's letter was printed on "Diamond Resorts International" letterhead and identified her as executive vice president and general counsel at DRI's "Corporate Headquarters" in Las Vegas, Nevada.

78.     The decision by the AOAO board — including Mr. Magdos, Ms. Windsor and Ms. Wheeler — not to release the membership list in February 2010 was a further violation of Article VI, Section 7 and Article III, Section 13 of the AOAO by-laws, for the reasons described above.

79.     In addition to blocking AOAO members' requests for the membership list, DRI directly threatened AOAO members participating in COPP and attempted

to compel COPP to cease its activities, using intimidation tactics similar to those used against Ms. Anderson.

80.    On February 26, 2010, Ms. Brennan sent a letter on "Diamond Resorts International" letterhead to COPP to the attention of the COPP members who had made requests for the membership list and others, in which she accused COPP of being an unlawfully constituted entity operating in violation of "Federal IRS laws as well as state consumer protection and licensing laws."  As with her other letters, the letter identified Ms. Brennan as executive vice president and general counsel at DRI's "Corporate Headquarters" in Las Vegas, Nevada.

81.    In the February 26, 2010 letter, Ms. Brennan demanded copies "within the next 24 hours" of, *inter alia*, all of COPP's organizational documents, all licenses and copyrights held by COPP, COPP's bank account information and identification of COPP's agent for service of process.  Ms. Brennan further demanded that COPP "immediately cease and desist in [its] illegal activities" and, *inter alia*, shut down its website.

82.    Ms. Brennan concluded her February 26, 2010 letter:

> If you fail to abide by my request, we will have no choice but to submit this matter to all Federal and State agencies, including but not limited to the IRS and Attorney General's Office of multiple states. In addition, if you fail to cooperate, we will file suit against the organization and all officers to protect our members and enjoin your illegal acts.  Such lawsuit would include claims for Injunctive Relief, Fraud, Civil Conspiracy, Defamation, Fraudulent and Intentional Misrepresentation, Intentional Interference with Contractual

Relations, International [sic] Interference with Prospective Economic Advantage, Negligence, Trade Name Infringement, etc.  We will seek compensatory and punitive damages against all of you personally, including a demand for you to pay all of our Company's attorney's fees and costs incurred to stop your improper activities.

I look forward to receipt of the requested documents and your immediate cooperation.

83.    In March 2010, Ms. Brennan informed Ms. Anderson that Ms. Brennan intended to "squash" COPP "like little bugs[.]"

## F.    DRI Has Used Its Control and Domination of the AOAO Board to Enrich Itself in Violation of the AOAO By-Laws

84.    On information and belief, while DRI was acting to block dissent and opposition on the AOAO board and by AOAO members, DRI used its control and domination of the AOAO board to force through, on dubious premises, a one-sided amendment of the management agreement under which DRI operated Poipu Point. The amendment resulted in significant financial benefit to DRI and was adopted in violation of the AOAO by-laws, as further detailed herein.

85.    In April 2008, the AOAO board held a special meeting by telephone to discuss "2007 and 2008 Budget Issues[.]"  The meeting was facilitated by Linda Riddle and attended by the following AOAO board members: Troy Magdos, Judy Bauckham, Jacalyn Anderson, Kathy Wheeler and Marilyn Windsor.  Mr. Magdos is and was a senior vice president with DRI.  Ms. Riddle also introduced the AOAO board members to meeting attendees Richard Cloobeck, whom she

identified as "Executive Vice President of Diamond Resorts International," and David Palmer, whom she identified as "Chief Financial Officer and Executive Vice President of Diamond Resorts International."  Mr. Cloobeck and Mr. Palmer both spoke at the special meeting.

86.    At the special meeting, DRI employees stated that, as a result of an independent audit conducted by "Diamond," DRI discovered that the AOAO and VOA owed DRI substantial sums for management services provided in 2007 and 2008.  According to DRI, the AOAO owed $213,951 for 2007 and $252,137 for 2008.

87.    According to the minutes of the special meeting, DRI proposed a written "Acknowledgement of Financial Arrangement for Debt Owed by the Association of Apartment Owners of Poipu Point to Diamond Resorts Management, Inc." (the "Acknowledgement of Financial Arrangement").  Under the Acknowledgement of Financial Arrangement, DRI waived collection of $121,294 of the amount purportedly owed for 2007 and $127,877 of the amount purportedly owed for 2008.

88.    On information and belief, DRI employees provided no convincing evidence of the indebtedness claimed for 2007 and 2008, other than assertions contained in the Acknowledgement of Financial Arrangement.

89.    In exchange for the partial waiver of purported amounts owed, the AOAO board agreed to amendments to the management agreement for the management of Poipu Point by DRI.

90.    Such amendments to the management agreement included staged increases in the management fee paid by the AOAO to DRI.  Effective January 1, 2009, the management fee increased to "cost plus 11% of the total assessments billed[.]"  Effective January 1, 2010, the management fee increased to "cost plus 13% of total assessments billed[.]"  Effective January 1, 2011, the management fee increased to "cost plus 15% of total assessments billed[,]" the maximum increase under the Acknowledgement of Financial Arrangement.

91.    The amendments also provided for DRI's free use of sales, office and utility space at Poipu Point and the right to rent all vacation timeshare intervals owned by the AOAO and be compensated by a fee equal to 30% of the rental rate obtained.

92.    Under the Acknowledgement of Financial Arrangement, the management agreement was extended for three years from January 1, 2009, automatically renewed for three year terms thereafter and "will require 51% of the members present either in person or via proxy at a duly called members meeting with a minimum 20% quorum requirement to terminate or not renew."

93.    The Acknowledgement of Financial Arrangement further provided that DRI would have sole right to use the AOAO membership list for commercial purposes.

94.    According to the minutes of the special meeting, Mr. Magdos, Ms. Bauckham, Ms. Anderson, Ms. Wheeler and Ms. Windsor voted unanimously to approve the Acknowledgement of Financial Arrangement.

95.    Because of their employment by DRI, Mr. Magdos, Ms. Wheeler and Ms. Windsor had a conflict of interest with regard to the approval of the Acknowledgement of Financial Arrangement.

96.    On information and belief, the AOAO vote to approve the Acknowledgement of Financial Arrangement failed to comply with Article III, Section 13 of the AOAO by-laws, previously described herein, in that Mr. Magdos, Ms. Wheeler and Ms. Windsor voted despite their conflict of interest, no disclosure of the conflict was made and no formal determination of the existence of a conflict regarding the DRI-employee directors was made by non-conflicted directors.

97.    In addition, the provisions in the Acknowledgement of Financial Arrangement prohibiting the AOAO board from electing not to renew the management agreement on the board's own authority and extending the term of the management agreement for three years violated other provisions of the AOAO by-laws.

26

98.     Article V, Section 2 of the AOAO by-laws requires that a

management agreement shall provide, *inter alia*, that the agreement be may be

terminated by the AOAO board of directors for cause on no more than thirty days'

written notice and without cause on no more than ninety days' written notice and

that no such agreement be for a fixed term exceeding one year.

99.     After the execution of the Acknowledgement of Financial

Arrangement, the management fees paid by the AOAO to DRI increased

significantly.  According to its audited financial statements, the AOAO paid

$41,064, $40,872 and $41,063 in management fees in 2006, 2007 and 2008,

respectively.  According to the most recent audited financial statements available,

the AOAO paid $414,940 and $628,421 in management fees for 2009 and 2010,

respectively — a ten- and fifteen-fold increase over the 2006-2008 amounts.

**G.     The $65.8 Million Water Intrusion Project and Assessment**

100.     On August 10, 2011, at an AOAO board meeting held at DRI's

corporate office in Las Vegas, Nevada, the AOAO board — including Ms.

Windsor, Ms. Dean and Ms. Wheeler — voted to authorize a $65.8 million

construction project affecting eleven of the buildings at Poipu Point (the "Water

Intrusion Project").  Defendants Goeckel and Toste attended the meeting in their

capacity as DRI employees.  Other DRI employees — including Linda Riddle,

who conducted the meeting — also attended.

27

101.   According to DRI, the purpose of the Water Intrusion Project is to restore and replace portions of buildings that were damaged as a result of water intrusion at the Resort.

102.   DRI has created a website, www.diamondresortshoa.com, that it uses to communicate with members and owners of vacation timeshare plans and resorts that DRI manages.  According to that website, the Water Intrusion Project will include, *inter alia*, the following:  the removal and replacement of the building envelope for each building and the its replacement with a new exterior finish insulation system and sheathing; the removal and replacement of framing, fasteners, connectors and straps; the replacement of doors and windows; the alteration of the structure of buildings through the addition of shear walls; the replacement of roofs and soffits; the addition of new waterproofing systems in exterior areas; and the replacement of flashings.

103.   According to DRI's www.diamondresortshoa.com website, the general budget categories for the Water Intrusion Project are as follows: a construction cost of $56,857,952, consultant costs of $2,374,193, a delinquency allowance of $3,896,500, a credit card fee allowance of $959,024 and administrative costs and fees of $1,734,860 — for a total of $65,822,529.

104.   There are only 219 lodging units at Poipu Point.  On a per-unit basis, the total cost of the Water Intrusion Project is $300,559 per unit.

105.   The Water Intrusion Project is to be paid for with a $65,822,529 assessment (the "Water Intrusion Assessment") that the AOAO board — including Ms. Windsor, Ms. Dean and Ms. Wheeler — authorized to be charged to owners of Poipu Point vacation timeshare intervals at a rate of $5893.32 per one-week interval.

106.   On information and belief and based on the total amount of the Water Intrusion Assessment and Defendant Cloobeck's statements regarding improvements that DRI has made to bring resorts up to "Diamond standards," DRI intends the Water Intrusion Assessment to be used for renovations and upgrades at Poipu Point other than the repair of damage caused by water intrusion.  DRI intends to force AOAO and DRHCMA members to pay for those renovations.

107.   DRI sent bills to individual Poipu Point interval owners in or around October 2011 in the name of the AOAO, with an initial payment installment, of at least $2000.00, due by January 1, 2012.  The Water Intrusion Assessment was charged in addition to owners' usual assessments and fees.  Even with the installment payment option, the amount charged was more than double the amount typically invoiced.

108.   The Water Intrusion Assessment was also billed to owners of points-based Hawaii Collection vacation interests.  Up to this point, DRI had made deliberate attempts to hide the existence of the water intrusion issues from Hawaii

Collection owners by, among other things: burying mention of it in the disclosure statement given to Hawaii Collection purchasers and not disclosing it in annual presentations to DRHCMA members.

109.   According to a frequently asked questions list posted on the www.diamondresortshoa.com website operated by DRI, the DRHCMA was billed approximately $23 million in Water Intrusion Assessment charges based on the Poipu Point intervals included in the Hawaii Collection.  DRHCMA then billed Hawaii Collection owners for the Water Intrusion Assessment at a rate of $0.1698 per point owned, which included further administrative costs added on by DRI. Such administrative costs are in addition to the administrative costs and fees already included in the Water Intrusion Project budget.  Bills were sent to DRHCMA members by DRI in or around October 2011 in the name of the DRHCMA.

110.   Owners of Poipu Point intervals and owners of Hawaii Collection memberships who do not pay the amounts billed to them under the Water Intrusion Assessment are not permitted to exercise their ownership rights to book vacations, are subject to late fees and potential collections actions and will eventually be subject to permanent forfeiture of their intervals and interests.

111.   On information and belief, Defendants DRI and Cloobeck caused the AOAO and DRHCMA boards to approve the Water Intrusion Project and Assessment.

112.   In or around October 2011, DRI held owner information meetings in California in an attempt to induce AOAO and DRHCMA members to pay the Water Intrusion Assessment.  DRI employees, including Elizabeth Brennan and Defendant Goeckel, spoke at those meetings on behalf of DRI.

112.   Defendants have refused to distribute a detailed plan and budget for the Water Intrusion Project to AOAO and DRHCMA members.  Instead, Defendants will allow members to inspect such documents only if members travel in person to Poipu Point or DRI's corporate offices in Las Vegas, Nevada.

**H.    The Water Intrusion Project and Assessment Are Invalid Under the AOAO and DRHCMA Controlling Corporate Documents**

113.   The Water Intrusion Project and Assessment were invalidly approved by the AOAO and DRHCMA boards in violation of the Poipu Point Declaration and the AOAO by-laws and in violation of the DRHCMA by-laws.

114.   Section 1 of Paragraph Q of the Poipu Point Declaration provides:

[R]estoration or replacement of [Poipu Point] or any building or other structure thereof . . . or structural alteration or addition thereto . . . shall be undertaken by the [AOAO] . . . only pursuant to an amendment of this Declaration, duly executed by or pursuant to a vote or the written consent of seventy-five percent (75%) of the apartment owners . . . and in accordance with complete plans and specifications therefor first approved in writing by the Board of Directors . . . .

31

115.   As detailed above, the Water Intrusion Project and Assessment involves the restoration or replacement of Poipu Point buildings and the structural alteration of those buildings within the meaning of Section 1 of Paragraph Q of the Poipu Point Declaration.

116.   On information and belief, the AOAO board — including Ms. Windsor, Ms. Dean and Ms. Wheeler — approved the Water Intrusion Project without a vote of the AOAO membership in violation of Section 1 of Paragraph Q of the Poipu Point Declaration.  Accordingly, the Water Intrusion Project and Assessment are void and invalid as contrary to the Poipu Point Declaration.

117.   Additionally, Ms. Windsor, Ms. Dean and Ms. Wheeler had a conflict of interest with regard to the Water Intrusion Project and Assessment because of their employment and familial relationships with DRI and because, as further detailed herein, DRI arranged the Water Intrusion Project and Assessment for its special benefit.

118.   On information and belief, Ms. Windsor, Ms. Dean and Ms. Wheeler voted to approve the Water Intrusion Project and Assessment despite their conflicts of interest and without complying with the requirements of Article III, Section 13 of the AOAO by-laws, as further detailed above.  For this reason also, the Water Intrusion Project and Assessment are void and invalid as contrary to the AOAO by-laws.

119.   Section 6.19 of the DRHCMA by-laws prohibits the DRHCMA board of directors from "[i]ncurring aggregate expenditures for capital improvements to the Collection Accommodations in any fiscal year in excess of ten percent (10%) of the budgeted gross expenditures of the [DRHCMA] for that fiscal year" without the vote or written assent of a majority of voting interest held by DRHCMA members.

120.   The budgeted gross expenditures for DRHCMA in 2012 are $48,180,811.  The approximately $23 million in Water Intrusion Assessment charges billed to Hawaii Collection members comprises approximately 47% of those budgeted gross expenditures.

121.   On information and belief, Defendants Wheeler, Goeckel and Toste, voted to approve the Water Intrusion Assessment and its billing to Hawaii Collection owners.  On information and belief, such conduct by Defendants Wheeler, Goeckel and Toste was contrary to the DRHCMA by-laws because the Water Intrusion Assessment is a capital expenditure that is greater than 10% of the budgeted gross expenditures for DRHCMA in 2012 and was not authorized by a member vote as required under the DRHCMA by-laws.  Accordingly, the approval of the Water Intrusion Assessment and its billing to Hawaii Collection members is void and invalid as contrary to the DRHCMA by-laws.

I.  **DRI Arranged the Water Intrusion Project and Assessment for Its Special Benefit**

122.  On information and belief, DRI, under the direction of Defendant Cloobeck, planned the Water Intrusion Project, caused the AOAO and DRHCMA boards to bill the Water Intrusion Assessment to AOAO and DRHCMA members and further used its control and domination of the AOAO and DRHCMA boards to manipulate the circumstances related to the Water Intrusion Project and Assessment to benefit DRI.

123.  Specifically, on information and belief, DRI delayed the Water Intrusion Project and Assessment to maximize its management fee and to allow it to minimize its financial obligations and is using the Water Intrusion Project and Assessment to tighten its control of the AOAO.

124.  Regarding management fees, as detailed above, under the Acknowledgment of Financial Arrangement, DRI's management fee for the AOAO reached its maximum rate of "cost plus 15% of total assessments billed[,]" beginning in 2011.  In 2009 and 2010, the rate was cost plus 11% and 13%, respectively.

125.  On information and belief, DRI caused the Water Intrusion Assessment to be charged in 2011 in order to claim the maximum amount provided for under the Acknowledgment of Financial Arrangement, 15% of the $65.8 million billed, either now or at some point in the future.

126.   Regarding DRI's efforts to minimize its financial obligations, as further detailed herein, the financial burden of the Water Intrusion Assessment falls most heavily on Poipu Point interval owners.  In the years leading up to the charging of the Water Intrusion Assessment, DRI significantly reduced its holdings of Poipu Point intervals.  In March 2010, DRI held 614 intervals.  At the time that the Water Intrusion Assessment was billed, DRI had reduced such holdings by more than half, which, on information and belief, significantly reduced the total amount of the Water Intrusion Assessment billed to DRI.

127.   Regarding the special burden on Poipu Point interval owners, on information and belief, DRI deliberately arranged the Water Intrusion Assessment to place a special financial burden on owners of such intervals.

128.   On information and belief, one purpose of DRI's strategy is to take permanent control of the AOAO board.  Specifically, DRI is attempting to use the Water Intrusion Assessment to reduce the number of individual owners of Poipu Point intervals and to increase the proportion of intervals held in the Hawaii Collection Trust.  The voting of Poipu Point intervals held in the Hawaii Collection Trust is controlled by DRI because DRI controls the DRHCMA board, as detailed herein.

129.   On information and belief, DRI intended the surprise of receiving a bill for thousands of dollars payable on two months' notice to induce owners of

Poipu Point intervals either to "trade-in" their intervals to DRI and purchase Hawaii Collection memberships in order to avoid such large charges in this future or simply to abandon their intervals, not pay the Water Intrusion Assessment and allow DRI to take the intervals. In either case, DRI will end up with control of the voting power associated with the traded-in or abandoned interval, as further described below.

130.   DRI salespeople have offered discounts or credits on the Water Intrusion Assessment to Poipu Point interval owners in attempts to induce such owners to trade in their intervals for points-based memberships.

131.   Defendant Cloobeck has also personally agreed to allow owners to surrender their intervals to DRI in exchange for waiver of the Water Intrusion Assessment. Such agreements, however, were contingent on owners having paid the purchase price of the intervals in full, typically thousands or tens of thousands of dollars.

132.   DRI expects and has planned for a significant number of interval owners who will not pay the Water Intrusion Assessment and will effectively abandon their intervals. As detailed herein, the Water Intrusion Project budget includes a delinquency allowance of $3,896,500 for unpaid Water Intrusion Assessment charges.

133.   Under an Internal Revenue Assignment Agreement ("IRAA") executed between DRI and the AOAO board, DRI is entitled to use, usually for rental purposes, the intervals of owners who are not current on amounts charged by the AOAO and may also take ownership of such intervals if non-payment persists. In exchange, DRI is required to satisfy unpaid balances associated with such intervals.  The IRAA is entered into on an annual basis.  The current version of the IRAA, however, does not require DRI to satisfy unpaid balances related to the Water Intrusion Assessment.  Nonetheless, the IRAA does allow DRI to use and take ownership of intervals where owners do not pay the Water Intrusion Assessment.

134.   Where DRI takes ownership of a Poipu Point interval, either through a trade-in transaction or under the IRAA, it places the interval in the Hawaii Collection Trust.  As alleged herein, DRI then has control of the voting rights associated with that interval because DRI controls the DRHCMA board.  DRI will then also be able to sell additional Hawaii Collection points based on that interval and profit from such sales.

**J.     Harm Suffered as a Result of Defendants' Conduct**

135.   Plaintiff Benedict was billed $8839.98 for the Water Intrusion Assessment.  He has made $2652 in installment payments towards the amount billed.  Under DRI policy, had he not made this payment, he would have been

prevented from using his Poipu Point vacation timeshare intervals and subject to late fees, collections actions and divestment of his intervals.

136.   Plaintiff Williams was billed $5893.32 for the Water Intrusion Assessment.  He has refused to make any payments because of the charging of the Water Intrusion Assessment.  Under DRI policy, as a result of such refusal to pay, he is not permitted to use his Poipu Point vacation timeshare interval, is subject to potential late fees and collections actions and eventually be divested of his interval.

137.   Plaintiff Baglino was billed $1059.50 for the Water Intrusion Assessment.  He paid the full amount billed.  Under DRI policy, had he not made this payment, he would have been prevented from using his Hawaii Collection membership and subject to late fees, collections actions and divestment of his membership.  Mr. Baglino sent a letter to DRI protesting the Water Intrusion Assessment.

138.   Plaintiff Brown was billed $2689.50 for the Water Intrusion Assessment.  He paid the full amount billed.  Under DRI policy, had he not made this payment, he would have been prevented from using his Hawaii Collection membership and subject to late fees, collections actions and divestment of his membership.

139.   Plaintiff Schmadeke was billed $570.50 for the Water Intrusion Assessment.  She paid the full amount billed.  Under DRI policy, had he not made

this payment, she would have been prevented from using her Hawaii Collection membership and subject to late fees, collections actions and divestment of her membership.

140.   Because Defendants threatened to impose late fees, initiate collections actions and suspend and eventually terminate the rights of owners of Poipu Point intervals and Hawaii Collection memberships based on non-payment of the Water Intrusion Assessment, payment of the Water Intrusion Assessment by members of the Poipu Point and Hawaii Collection Classes (as alleged herein) was not voluntary and does not evidence or constitute assent to the Water Intrusion Project and Assessment.

141.   By this action, Plaintiffs seek remedies for themselves and the other members of the Poipu Point and Hawaii Collection Classes (as alleged herein) based on harm suffered by Plaintiffs and other such class members.

## IV.

## CLASS ALLEGATIONS

142.   Plaintiffs Benedict and Williams bring the first and third causes of action asserted herein on behalf of themselves and all other similarly situated persons as members of a class defined as follows:  All persons who were billed the 2012 Water Intrusion Assessment by the Association of Apartment Owners of Poipu Point (the "Poipu Point Class").  Excluded from the Poipu Point Class are

Defendants, any entity in which any Defendant has or had a controlling interest, any entity which has or had a controlling interest in any Defendant, any executives and officers of any Defendant, the legal representatives, heirs, successors, and assigns of any Defendant, and any judge assigned to this action and his or her immediate family.

143.   Plaintiffs Benedict and Williams are members of the Poipu Point Class.

144.   Plaintiffs Baglino, Brown and Schmadeke bring the second and fourth causes of action asserted herein on behalf of themselves and all other similarly situated persons as members of a class defined as follows:  All persons who were billed the 2012 Water Intrusion Assessment by the Diamond Resorts Hawaii Collection Members Association (the "Hawaii Collection Class").  Excluded from the Hawaii Collection Class are Defendants, any entity in which any Defendant has or had a controlling interest, any entity which has or had a controlling interest in any Defendant, any executives and officers of any Defendant, the legal representatives, heirs, successors, and assigns of any Defendant, and any judge assigned to this action and his or her immediate family.

145.   Plaintiffs Baglino, Brown and Schmadeke are members of the Hawaii Collection Class.

146.    This action has been brought and may be properly maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.

147.    **Numerosity** — Fed. R. Civ. P. 23(a)(1):  Members of the Poipu Point and Hawaii Collection Classes are so numerous and widely dispersed that joinder of them in one action is impracticable.  While the precise number of class members is unknown to Plaintiffs at this time, the Poipu Point and Hawaii Collection Classes are each believed to number in the thousands.  The identity of each and every class member is readily ascertainable from billing information and records in Defendants' possession, custody or control.  Members of the classes may be notified of the pendency of this action by first-class or electronic mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

148.    **Common and Predominant Questions of Fact and Law** — Fed. R. Civ. P. 23(a)(2), (b)(3):  Common questions of law and fact exist as to all members of the Poipu Point and Hawaii Collection Classes and predominate over any questions affecting only individual class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether the Water Intrusion Project and Assessment are void and invalid under the Poipu Point Declaration and AOAO by-laws and the DRHCMA by-laws;

41

(b)      whether Ms. Windsor, Ms. Dean, Ms. Wheeler, Mr. Goeckel and Mr. Toste breached their fiduciary duties to the Poipu Point and Hawaii Collection Classes;

(c)      whether Defendants DRI and Cloobeck caused the Water Intrusion Project and Assessment to be approved and charged;

(d)      whether Defendants DRI and Cloobeck's conduct as alleged herein constitutes unfair or deceptive trade practices

149. **Typicality** — Fed. R. Civ. P. 23(a)(3):  Plaintiffs' claims are typical of the claims of the members of the Poipu Point and Hawaii Collection Classes in that Plaintiffs and all class members were charged the Water Intrusion Assessment by Defendants.

150. **Adequacy** — Fed. R. Civ. P. 23(a)(4):  Plaintiffs will fairly and adequately protect the interests of the Poipu Point and Hawaii Collection Classes in that Plaintiffs have no interests that are adverse or antagonistic to those of the Poipu Point and Hawaii Collection Classes.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

151. **Superiority** — Fed. R. Civ. P. 23(b)(3): A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The economic harm suffered by each individual class member may be limited.

Given the size of individual class members' claims, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for class members to seek redress individually for the wrongs done to them.  The likelihood of individual class members prosecuting separate claims is exceedingly remote, and even if class members could afford individual litigation, given the size of the Poipu Point and Hawaii Collection Classes, the court system could not.  Individual litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.  By contrast, a class action will present far fewer management difficulties, promote an orderly and expeditious administration and adjudication of the class claims, foster economies of scale, ensure uniformity of decisions, and provide comprehensive supervision by a single court.

# V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty

### By Plaintiffs Benedict and Williams and the Poipu Point Class

### Against Defendants DRC, DRP, DRH, RMII and Cloobeck

152.   As directors on the AOAO board of directors, Windsor, Dean and Wheeler owed a fiduciary duty to Plaintiffs Benedict and Williams and other members of the Poipu Point Class.

153.   Windsor, Dean and Wheeler breached that fiduciary duty by the following conduct, as more fully alleged herein:

(a)   allowing Defendants DRI and Cloobeck to control and dominate the AOAO board of directors for the benefit of Defendants DRI and Cloobeck and assisting Defendants DRI and Cloobeck in exercising such control and dominance;

(b)   failing to comply with requirements of the AOAO by-laws regarding conflicts of interest related to their employment by DRI and familial ties to DRI employees; and

(c)   authorizing the Water Intrusion Project and Assessment without the vote of AOAO apartment owners required under the Poipu Point Declaration.

154.   Windsor, Dean and Wheeler engaged in such conduct on behalf of and as the agents and/or employees of Defendants DRI and Cloobeck as alleged herein. Defendant Cloobeck actively participated in the conduct as alleged herein.

155.   As a result of Windsor, Dean and Wheeler's breach of their fiduciary duty, Plaintiffs Benedict and Williams and other members of the Poipu Point Class have suffered harm as alleged herein.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### By Plaintiffs Baglino, Brown and Schmadeke and the Hawaii Collection Class Against Defendants Wheeler, Goeckel, Toste, DRC, DRP, DRH, RMII and Cloobeck

156.   As directors on the DRHCA board of directors, Defendants Wheeler, Goeckel and Toste owed a fiduciary duty to Plaintiffs Baglino, Brown and Schmadeke and other members of the Hawaii Collection Class.

157.   Defendants Wheeler, Goeckel and Toste breached that fiduciary duty by the following conduct:

(a)   authorizing the billing of the Water Intrusion Assessment to DRHCMA members when they had notice and/or actual knowledge that the Water Intrusion Assessment and Project were invalid under the Poipu Point Declaration; and

(b)     authorizing the billing of the Water Intrusion Assessment to DRHCMA members without the membership vote required under the DRHCMA by-laws.

158.   Defendants Wheeler, Goeckel and Toste engaged in such conduct on behalf of and as the agents and/or employees of Defendants DRI and Cloobeck as alleged herein.  Defendant Cloobeck actively participated in the conduct as alleged herein.

159.   As a result of Defendants Wheeler, Goeckel and Toste's breach of their fiduciary duty, Plaintiffs Baglino, Brown and Schmadeke and other members of the Hawaii Collection Class have suffered harm as alleged herein.

## THIRD CAUSE OF ACTION

### Unfair or Deceptive Trade Practices Under Haw. Rev. Stat. § 480-2

### By Plaintiffs Benedict and Williams and the Poipu Point Class

### Against Defendants DRC, DRP, DRH, RMII and Cloobeck

160.   Plaintiffs Benedict and Williams and other members of the Poipu Point Class are consumers.

161.   Through their control and domination of the AOAO board, Defendants DRI and Cloobeck caused the Water Intrusion Assessment to be charged to Plaintiffs Benedict and Williams and other members of the Poipu Point Class and caused the Water Intrusion Assessment to be represented as a valid

charge that Plaintiffs Benedict and Williams and other members of the Poipu Point Class were obligated to pay or face suspension of their interval rights, potential late fees and collection actions and divestment of their intervals.

162.   In fact, as alleged herein, the Water Intrusion Project and Assessment were invalid under the Poipu Point Declaration and AOAO by-laws.

163.   Because the Water Intrusion Project and Assessment were invalid and effected by means of the improper control and domination of the AOAO board, Defendants DRI and Cloobeck's conduct constitutes unfair or deceptive trade practices that injured Plaintiffs Benedict and Williams and other members of the Poipu Point Class as alleged herein.

## FOURTH CAUSE OF ACTION

### Consumer Fraud and Deceptive Trade Practices Under

### Nev. Rev. Stat. §§ 41.600, 598.092 and 598.0923

### By Plaintiffs Baglino, Brown and Schmadeke and the Hawaii Collection Class

### Against Defendants DRC, DRP, DRH, RMII and Cloobeck

164.   Through their control and domination of the AOAO and DRHCMA boards, Defendants DRI and Cloobeck, in the course of their business or occupation, knowingly caused the Water Intrusion Assessment to be charged to Plaintiffs Baglino, Brown and Schmadeke and other members of the Hawaii Collection Class and knowingly caused the Water Intrusion Assessment to be

represented as a valid charge that Plaintiffs Baglino, Brown and Schmadeke and other members of the Hawaii Collection Class were obligated to pay or face suspension of their membership rights, potential late fees and collection actions and divestment of their memberships.

165.   In fact, as alleged herein and as known by Defendants DRI and Cloobeck, the Water Intrusion Project and Assessment were invalid under the Poipu Point Declaration and AOAO by-laws and the DRHCMA by-laws.

166.   Because the Water Intrusion Project and Assessment were invalid and effected by means of the improper control and domination of the AOAO board, Defendants DRI and Cloobeck's knowing conduct constitutes consumer fraud and deceptive trade practices that injured and victimized Plaintiffs Baglino, Brown and Schmadeke and other members of the Hawaii Collection Class as alleged herein.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

a.      For an order certifying the proposed Poipu Point and Hawaii Collection Classes herein under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs and their counsel of record to represent said Classes;

b.      For a judicial declaration that the Water Intrusion Project and Assessment are invalid, void and without legal effect;

c.      For an order enjoining the Water Intrusion Project and Assessment;

d.      For an accounting and restitution of all money obtained from members of the Poipu Point and Hawaii Collection Classes in connection with the Water Intrusion Project and Assessment;

e.      For actual and treble damages in an amount to be determined at trial;

f.      For attorneys' fees and costs of suit, including expert witness fees;

g.      For an order awarding pre-judgment and post-judgment interest as prescribed by law; and

h.      For such other and further relief as this Court may deem just and proper.

## VII.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

\\

\\

\\

\\

\\

Dated:  April 5, 2012               Respectfully submitted,


                                    William M. McKeon
                                    Keri C. Mehling
                                    MCKEON IMLAY MEHLING
                                    A Limited Liability Law Company
                                    2145 Kaohu Street, Suite 203
                                    Wailuku, Hawai'i 96793
                                    Telephone: (808) 242-6644
                                    Facsimile: (808) 244-9775

                                    Jonathan K. Levine (*pro hac vice* to be filed)
                                    Elizabeth C. Pritzker (*pro hac vice* to be filed)
                                    Todd Espinosa (*pro hac vice* to be filed)
                                    GIRARD GIBBS LLP
                                    601 California Street, Suite 1400
                                    San Francisco, California 94108
                                    Telephone: (415) 981-4800
                                    Facsimile: (415) 981-4846

                                    Andrew N. Friedman (*pro hac vice* to be filed)
                                    Douglas J. McNamara (*pro hac vice* to be filed)
                                    COHEN MILSTEIN SELLERS & TOLL PLLC
                                    1100 New York Avenue NW
                                    Suite 500 West
                                    Washington, DC 20005
                                    Telephone: (202) 408-4600
                                    Facsimile: (202) 408-4699

                                    *Attorneys for Individual and Representative*
                                    *Plaintiffs Bruce Benedict, Joe Williams, Joseph*
                                    *Baglino, James Brown and Adrienne Schmadeke*

HID 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Hawaii

| | |
|---|---|
| Bruce Benedict, et al. | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| Diamond Resorts Corporation, et al. | ) |
| _____ | ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Diamond Resorts Corporation; Diamond Resorts Parent, LLC; Diamond Resorts
Holdings, LLC; Resort Management International, Inc.; Stephen J. Cloobeck;
Kathy Wheeler; Frank Goeckel; and Jason Toste

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you
are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ.
P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of
the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney,
whose name and address are:    William M. McKeon (bill@mimhawaii.com)
Keri C. Mehling (keri@mimhawaii.com)
MCKEON IMLAY MEHLING, A Limited Liability Law Company
2145 Kaohu Street, Ste. 203
Wailuku, HI  96793

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.
You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:   APR 0 6 2012

**SUE BEITIA**

*Signature of Clerk or Deputy Clerk*

Deputy Clerk, United States
District Court, District of Hawaii